Thank you, Your Honors. May it please the Court, my name is Robert Thurston. I represent the appellants. The father of J.G. is in the courtroom with me today and I would like to initially say reserve five minutes for rebuttal. I'll try and keep track of the clock, thank you. So appellants are asking this court to address three critical issues in special educational law, specifically burden of inquiry, right to present evidence, and the last is how the least restrictive environment, the LRE requirement within IDEA law has been interpreted and applies in this case. And what's critical for Your Honors to know initially is that this is also about how the Hawaii Department of Education has been, their policies for handling IDEA law. And specifically, to give you an example of where this is critical in this case, this child alone has been to this court four times. Twice in a separate case, twice in this case. And that shows you how important what's going on here and why these issues are so critical. So let me start first by talking about the burden of proof issue. And what I look at the best case for that because it doesn't seem like you have a good case for that. Okay, well thank you, Your Honor. So what I do is I want to point you to MC versus Antelope Valley Union High School District 858 F3rd 1189, which is from this court, the Ninth Circuit in 2017. In that case, this court said the burden shifts to the school district when it is impossible for parents to assess the substantive reasonableness of services offered in the IEP. And actually, that's very much on point, Your Honors, with this case. I didn't think it was because it seems to me that this case is unique in that we're not really talking about curriculum, we're talking about the location where the curriculum is going to be delivered. It's not about the services offered in the IEP. That's correct. But it's the same concept, which is proving the negative, Your Honor. For example, in this case, JG was not at the facility that was being proposed. So there was no data. There's no way to know if those services are going to be implemented correctly, if they had the resources to provide those services, and so forth. So that's why you're forcing a parent to prove the negative of what that school is, if it's appropriate or not appropriate, when they know nothing about the school. It strikes me as something that might bear on your procedural due process claim, but I think we understand your argument on this point. Okay. Thank you, Your Honor. I have a question. Yes. You know, I'm not sure that I agree with this, but I think this is what the law is. You know, like the military has these advertisements, be all that you can be. When I read the IDA, it seems to me that it doesn't adopt that. I'm not sure I agree with it, but it basically is a floor as opposed to a ceiling. And so it isn't a situation where just because it would be better somewhere else, that's not, or it's not ideal. We have to analyze it in terms of what FAPE requires and all of that, which isn't, you're entitled to the best or the ideal. And so that seems to me here, and the way I understand the facts in this situation, that the minor's parents opened their own school, which appears to be a good school, and that's where he's been going. And the school district wants to put him in this new school. And so I can't really look at it from the standpoint, is one school better than the other school? I have to look at it in terms of the construct of the law. Am I right on that? That's correct, Your Honor, except I'll challenge you on your analogy. And I'll say that the US Supreme Court in Andrew F. in 2017 came down and said that we used to use this kind of under Rowley analogy of, well, the child's not entitled to a Cadillac, which is what you're suggesting. They're entitled to- I mean, I don't like that. I don't like that. I understand that. But the Supreme Court actually said, no, that's not a good use. And Rowley, they said, while Rowley established the law, it didn't apply in that case. Because in Rowley, it was a child who was progressing through the curriculum, grade to grade, on a fairly easy basis. Andrew F. addressed a situation where a child was not able to progress through the curriculum on a regular basis. And that's what we have here, Your Honor. We have a very severely autistic child who struggles and is not going to be able to progress through the curriculum. But again, severely autistic. Can you describe better what that means? Does he have speech? Can you describe the minor better here? Yes, that's fine. Thank you, Your Honor. So he does not have a lot of speech. He has a lot of very severe behaviors. And in fact, depending on the environment, those behaviors get actually self-injurious and violent. Not violent to other people, but violent to himself. He's not very good at communicating with other people, although he can be given the right environment. So there's a lot of factors. And what your question is going to is whether or not the least restrictive environment, the environment that's proposed, provides FAPE. And we would argue that it's pretty clear, even from the record, Your Honor, that the proposed new environment did not provide a FAPE. In fact, it did not provide the least restrictive environment. Their own expert, Ruth Ballinger, basically testified that if he was going to be the only full-time student at the new facility, but he was not the only full-time student at the existing facility, which was factually true. JG would have been the only full-time student at this new facility. Their own expert said that would have been a more restrictive environment, the new one. And that's not what IDEA says. IDEA says you have to have the child in the least restrictive environment that that child can learn and progress in. And that's what we have here. And that's why it was not a FAPE offer for the new facility. Yeah, I'm sorry, Judge. Is that your strongest argument on the least restrictive alternative? Well, I think there's a lot of aspects of that. Because again, just circling back, I appreciate Judge Callahan's questions and your response to this, but this is not a curriculum case, right? Right, that's right. So we're talking about the location where the services are going to be offered? That's correct. And so the state, I think, relies pretty heavily on its finding that this, or conclusion, that this was the least restrictive alternative. And it's a peculiar case in that way, because the new school is both new, the record is a little unclear, well, it just is unclear about the number of students who are in attendance, and then it says that it's in this tech park. Right. But the hearing officer heard that evidence and decided that JG would have greater access to peers at the new facility than at the existing facility. Can you speak to that, please? Yeah, thank you, Your Honor. And that goes to, obviously, a credibility issue that the hearing officer dealt with. But the facts were completely contrary to that. I'm not talking about, just to be clear, I'm not asking you to speak to the credibility issue. I'm just talking, if you could speak to the two facilities and JG's access to other neurodeveloping children, peers. Absolutely. Okay, so let me give you quickly the development of the Maui Autism Center, and then I'll speak to what I know about the Po'okela Center. At the Maui Autism Center, it started as a facility where they were on the campus of a Catholic school. So they shared facilities, they interacted with peers in both facilities. Right, and that was really hard for JG. It was initially hard, but he adapted very well. And then what happened then was, as the facility grew, Maui Autism Center grew, more and more of those interactions happened. There was better access to neurotypical peers, there were so forth. At the new facility, and this is, again, the record's not real clear, but from what we gathered from the record, was that JG was going to be the only full-time student there. The access to neurotypical peers would have been only in field trips, because this facility was, like we said, in a tech park. Right, and so we've read all this, and I'm not trying to, I mean, we have read it, and I'm just worried that your time is ticking, and so I'm trying to get at the legal question before us. Are you asking us now to second-guess the finding of fact about where he was going to have greater access to peers? I just want to be really clear about your argument, please. What I'm asking the court to do is look at the fact that what is really required in the law for least restrictive environment, and was that being met between these two facilities? Like I said, going back to it, their own experts said it would not have been at the new facility. The parents took the position that they had not, and there's a little bit of scuffle over this, but the parents had taken the position they at least had not visited the new facility, and then the district in the fifth meeting offered to set up a tour, and my understanding is that the parents did tour the facility the next day, and that's where our record ends. I can't tell, but this is a question. Do I have anything in the record that tells me whether they found anything there on that site visit that concerned them? Yeah, let me correct that a little bit, Your Honor. So what happened was, at the fifth IEP meeting, they were first told about this facility. Now, whether or not the HO believed them or not about whether they knew it, but they immediately went from the termination of that meeting to the facility. At that facility, they met with Chad Takamura, I believe his name was, who said, oh, yeah, we're expecting your child to come here soon. They didn't know anything about this, so to answer your question. It's a predetermination argument, but I'm asking a different question. Right. Do we know anything what happened after that? This child has serious sensory issues. We went through the record, and they're explained quite clearly. My question is, his parents surely know him. They're a very involved set of parents, and they know him well. So my concern is, and my question is, does the record tell us anything about whether they encountered anything, sight, sound, smells, noises, that were going to be difficult for JG when they did tour the new facility? Yes, and I'm almost out of my time. Where is that in the record? Could you just give me the site? The site for that, Your Honor, is in, they have difficulties in, for example, the lighting of the facility and the lack of resources. It's in the record, roughly, Your Honor, at ER 000, pardon me for a moment. Why don't you look at it? Yeah, let me bring that up on a rebuttal. I'll provide you that part of the record. All right, thank you, Your Honors. Good morning, Your Honors. Deputy Attorney General Cunio Cuave, appearing today on behalf of the Department of Education. Before I start my formal presentation argument, may I just clarify the record with respect to the comment made by opposing counsel regarding the DOE policy of handling IDA cases. And he cited the fact that this particular case has been for this court on two occasions. That's true in a sense because during a very early phase of this case, appellants filed an interlocutory appeal to this court challenging the pre-hearing decisions by the AHO on a motion for burden of proof and a motion for a site visit, which was then appealed by the appellants to the Federal District Court. And when the Federal District Court denied a TRO, the appellants then filed an interlocutory appeal to this court back in 2018, I believe, which was eventually dismissed. So that was the first case involving this family and, I would suppose, this case. But the actual case that we're talking about is on appeal right now before this court for the first time. So it wasn't two times that this case has been before the court. And with respect to the other case, although that's been cited in both appellants' opening brief before Your Honors and at the Federal District Court level, it was also cited in their opening briefs before Judge Watson, the other case that they're talking about is an IEP from November 2010, which went through multiple legal proceedings. It went to the Federal Court twice after a remand to the Administrative Hearing Officer. Then eventually it was appealed to the Ninth Circuit, and I had the pleasure of actually arguing for a different panel on that case back in 2016. So that case was then decided by a different panel on a different IEP on a different issue. So that case didn't involve the same issues that I presented before Your Honors today. Well, so what about given that the student seemed to be doing well at the Maui Autism Center, why shouldn't the burden of proof be on the state when it seeks to place the student in a different school through a new IEP? Well, Judge Callahan, if I may, besides citing the fact that Schafer controls, there is nothing in the facts of this case that dictate changing the burden of proof. Certainly placement was different in the March 2017 IEP. Well, he was doing well at Maui Autism Center, right? By their report, yes. So, but it cost $14,000 a year, right? No, it was $14,000 a month. A month, I'm sorry, $14,000 a month. So obviously if he goes to a school that's not private like that, that's going to save the district a lot of money, right? Which was an argument made by appellants at the administrative level, an argument which was rejected by the AHO who heard the evidence supporting that argument, and there's no evidence that establishes that the AHO... Well, I guess I'm trying to make, I'm just trying to make his argument, if the student was doing well there, why isn't it speculative that he would do well somewhere else? Why upset the apple cart with a student that clearly has significant issues? It's not, I mean, no one's really, that doesn't seem to be in dispute, right? Your Honor, that is true. But it also disrespects the ability of the Department of Education who has professional educators, who has all the resources of speech and language pathologists available, behavioral analysts, to do what is right by the IDA, which is to provide the public education this child is entitled to. And only if they cannot provide that public education... Well, was he getting that at the other school? All of those same things? Yes. And what happened in the interim, Judge, is that a DOE had developed a new school which had not been in existence before. And plaintiffs have argued at the administrative level, and they're arguing here today. It's an experiment, but again, that does disservice the DOE professionals who are licensed to provide an education. There's no evidence established in the record that this facility could not provide what every student is entitled to under the IDA, including students that had been there, other students that had been there, and this student was projected to be there. So if he goes there, if J.G. goes there, how soon will he have an IEP after he goes there? Well, as soon as he shows up, there has been discussion, I understand, between the parents and the current DOE homeschool, which is now a different school, about scheduling an annual IEP. Well, I guess my point is, all right, you're saying that the department says, okay, we have everything that he needs, and we think this is a better place for him, that it's the least restrictive environment. What if J.G. gets there, and anytime we're talking about humans, they don't always respond as experts think that they would. What if he completely degenerates, and he's doing much worse? I mean, he's obviously an adolescent male as well, and what if he is really doing poorly? Then what happens? Your Honor, I don't mean to be disrespectful, and I say this with all caution, but I was taught both as a law student and as a lawyer, as much as possible, to avoid speculation. But what I will say is, the Department of Education has dedicated licensed professionals. That is beyond dispute. Now, sometimes issues have arisen regarding provision of fate with the Dewey. They're regularly evaluated, is my point. Yes, yes. And so, if this school doesn't do what you're saying it is going to do, and if he doesn't do well there, then it will be evaluated, right? Yes, ma'am, and I expect the family, which has the right to do so, will file a due process complaint, claiming that the Dewey has not provided the fate that they're entitled to. It would be really unfortunate if it was left to that, because that means another year. Let me back up, if I could, and ask directly about what, for me, is the most difficult part of this case, and that is the parent's ability to have meaningful participation. Okay. There are five meetings, very involved, very caring parents, no question. I think no question about that. And in many ways, the group can be commended, I think, for agreeing and working so constructively on the curriculum, and then they got down to this question of where is this supposed to take place? And I recognize that I'm a million miles away just reading the cold record, but that's how it looks to me. So the good news is nobody disagrees on the curriculum, nobody agrees that J.G. is entitled to, he requires, and he's going to get one-on-one instruction, and there's a lot to be grateful for in terms of, and it's different than in a lot of cases. So that's good. But the last meeting concerned me, because it looks like these parents weren't told about this new school. I think they probably knew about it, knew of it, but it is concerning to me that it looks like the decision was made before they had had a chance to visit. I realize they visited immediately thereafter, but it does look to me, and I'm going to invite you to tell me if I'm missing this in the record, that the decision was made and then the parents went to visit. Is that wrong? That part of the record is correct, Your Honor. Well, it's very concerning to me, Counsel, and I want to give you a chance to respond, because this child is not just like any other, I mean, there's almost no such thing as any other autistic child. We're talking about his individual needs, and he has really serious sensory issues. So what about that? Is it typical that Hawaii would have the decision made before the parents have an opportunity to visit the school? Well, I think each case differs on its facts. In this case, you're talking about a student that does have significant behavioral needs. When he has sensory issues, that's a little different. I'm talking about whether lights or smells or sounds could be really agitating to him and make that location an inappropriate place to deliver his education. So I'd like to hear what you have to say about that. That was the argument made, but there are no facts established at the administrative level which establish that that facility was inappropriate for the student. Opposing counsel thought, and this is going to be your last time at the microphone, I think the parents then, once they had a chance to see the facility, did they raise any concerns about it that would have implicated the sensory issues? And he says that there's a place in the record. Do you have something to add? No, Your Honor. The only thing I'm aware of after the meeting was that they did visit that afternoon, and then they wrote a letter to the school, which is part of the record in this case. And that's the only evidence I have regarding whatever comments they wanted to make about that facility. Okay. And then my next question, I think, just follows up on Judge Callahan's, which is that if the district prevails, am I right that the very next step is going to be working with the parents to develop a transition plan? Because we don't have one yet. Yes, Your Honor. And that was established at the administrative level and also acknowledged and affirmed by Judge Watson, which is there was an offer to have a transition meeting. Actually, it was more than an offer. It was a specific proposal of dates to meet in a further IP meeting to develop a transition plan, yes. That's right. And people were pointing fingers at one another about why it didn't happen, and I'm really not, to be blunt, not very interested in that. I'm just asking, is it the department's position that the next step would be to work with the parents to develop a transition plan? Oh, absolutely, Your Honor. And this is experience that the department has had with other students who sometimes transfer from a private facility back to the public setting. And so it's, and it's something that's, I don't want to say commonplace, but it's not rare in special education cases where there's this transfer of students from a private facility back to a public setting. And schools, and the Department of Education is one of them, have protocols, processes set up to have a transition phase that would then address the transition needs, such as increase in self-injurious behaviors, addressing needs such as, for instance, this matter of the fluorescent light. There's no, there's nothing in the record that fluorescent lights couldn't be taken out of that particular facility. I'm just pointing out, the fact is the administrative hearing, where all these facts are developed, is barren of all these arguments. There are no facts that support the arguments that Appellant's Counsel is raising today. He talks about, for instance, this scenario of the number of students. Can you clarify the number of students? Yes, the number of students at the time of the IP meeting, I believe, was somewhere around four or five. And that's reflected in the administrative hearing officer's decision. At one place it says one, and at another place it says four or five. Right. So there was, I think, one when the, as I recall, when the parents went to visit, they only saw one student that afternoon of that IP meeting. They only saw one student there. But when the IP meeting was scheduled, or when the IP meeting proceeded in March 2016, around that time frame, there was, from the testimony of the department representatives, and it was primarily the special education teacher, Julia Whiteley, there were approximately five students that were, that made up that population at that facility. But, Your Honor, the primary point is, if socialization needs require a certain number of students, that would be part of the department's duty and obligation to provide that and implement that as part of the IEP. So, while arguments are being made about, you know, particular needs of a student population, that was never established as an IEP need. That was never documented or referenced. I don't think that's quite right, counsel, because the least restrictive alternative analysis in this case is the analysis that this child needed to be in a place where the information could be delivered and he would have more contact with his peers. So, that's part of the, in fact, that's central to this analysis. Yes, but the opportunities that we're talking about is what the IDA requires, which is opportunities with the general education population. And that's referenced throughout IDA cases that talk about the LRE. It's also statutorily prescribed in 1415 about what LRE means. It refers to the general education population. That's why in the spectrum, we start from general education students all the way down to the hospital setting, we absolutely have no exposure to anyone. So, on the spectrum, this public separate facility, which had access to the DOE homeschools of the respective students who made up that population, had access to the general student, general education population of the respective homeschools, besides having the peer group who are in that facility. So, that is the significant difference between that public separate facility and the autism center. And, Your Honor, I realize difficult cases or difficult facts make difficult cases, but I think it's disrespectful to the Department of Education that plaintiffs can argue without proof that this facility, which is manned by a licensed DOE professional who has had extensive training in behavioral services, a program specifically established for these types of students, is a farce, as appellants claim. There's absolutely no evidence to support that kind of specious argument. So, unless Your Honors have any further questions, I'm done. Thank you, Counsel. Thank you very much. If I may, Your Honors, I'll address a couple of the questions that were lingering. Let me first draw your attention in the record, and actually this is a finding, a fact, that the AHO made, that the private separate facility, which was Pocayella, has fluorescent lighting. That's a transcript, page 46, lines 3 to page 47 to line 23. She actually made that specific finding. So, Counsel, again, Mike, if you could help me out. My question is, did the parents see something, anything, whether it was lighting or anything else, that caused them concern that their child was going to have sensory issues at the new facility? Yes, and the fluorescent lighting was one of those issues. You just pointed to a place where it said that the school has fluorescent lighting. Yes. Okay, where does it tell me that the child will have issues with fluorescent lighting? Not all kids do? I don't know if that specific issue was raised or if it's in the record, but there's a long history with this child and the parents' input. And that's, by the way, Your Honor, that's part of the problem here. And I think you even asked a question of Counsel on that point, which is that the parents really had no opportunity to see this facility before its proposal, had an opportunity once they saw the facility to come back, because in the record, it's very clear that the principal, during the IEP meeting, said, I've made my FAPE decision, this is it, we're done, and actually told the parents to leave the IEP meeting. Well, that part of the transcript is certainly unfortunate, but it's a little hard for us to tell what really happened, because there was also an offer to tour the facility, and the parents did tour the facility immediately, and that's why I'm asking this question. Well, to my knowledge, Your Honor, there's no part in the record that showed that there was an offer by the DOE for the parents to visit. The parents took it upon their own initiative to visit, because they had never heard of this facility, or perhaps they had heard of it, but they didn't know where it was or any facts about it. And that gets back to the burden of proof, Your Honor, which is that how are the parents supposed to prove that this was an inappropriate facility if they know nothing about it, and then even when they get to tour it, they're not given an opportunity to come back to the IEP meeting and say, well, this doesn't seem right, I have this issue, this issue, this issue with that facility. They were never given that opportunity. Is the ER site that you were going to give me available? Actually, no, it's a transcript site. So a couple things I want to give you. The one I just gave you, transcript page 46, this is the administrative record transcript, page 46, line 3 to page 47 to line 23. There's also a transcript page 2,887, line 25 to 2,888, line 5. Let me also address one other thing that you raised, and the issue about the number of students, that's also in the AHO's findings of fact, and it's in the transcript record of transcript page 528, line 7 to page 529 to line 8. And basically, the finding is there are currently five to six students at the private separate facility. Those students were part-time, and that's in the record, under multiple testimonies. Ms. Whiteley, Ruth Ballinger. Right, but we don't know anything more than that. Well, that's right, and we do know that those were only the part-time facility. But any of that in the excerpts of the record? I'm sorry? Did you put any of these documents in the excerpts of record? The trans, portions of the transcripts are in the excerpts of record, yes. The ones that you cited, the ones that you just cited, were they in the record? That's a good question. I thought they were, but perhaps I was citing to the AHO's, the AHO's decision. So, I'd have to double-check that, Your Honors, but, but that, that's, those are, what I cited is from the AHO's decision. So, those facts are based on her findings of fact. Your time has expired, but I'll allow you to make a couple of concluding remarks. Okay, thank you very much, Your Honor. So, also in the findings of fact, and this is kind of to wrap all these, these questions up, AHO found parents noted the harmful effect the change in placement would cause such as regression and an increased SIB, self-injurious behaviors, and that's really what's going on here. As we said in the brief, and we made the argument about change is very difficult for kids with autism, there was, this was going to be a dramatic change, could have resulted in self-injurious behaviors, and that, in fact, the parents had seen that before, and they were not allowed that, that input was not recognized by the IEP team, and so, and without a transition plan to, a plan to explain how that was going to be addressed, this was just not an offer of fate by the DOE. Thank you, Counsel. Thank you, Your Honors. Thank you both for your arguments today. The case just argued will be submitted for decision.
judges: Thomas, Callahan, Christen